UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HELAINE DOMINGUEZ,

                     Plaintiff,                    ECF Case

        - against -                     COMPLAINT

JEWISH BOARD OF FAMILY AND          PLAINTIFF DEMANDS A
CHILDREN'S SERVICES and AVROHOM ADLER,    TRIAL BY JURY

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Helaine Dominguez ("Dominguez" or "plaintiff"), through her attorneys, Vladeck, Raskin & Clark, P.C., complains of defendants Jewish Board of Family and Children's Services ("JBFCS") and Avrohom Adler ("Adler") (collectively "defendants") as follows:

NATURE OF ACTION

        1.     After dedicating her professional life to the care of profoundly and chronically disabled people, at the age of 66 after taking a leave of absence to care for her own disabled son, Helaine Dominguez's employment of 11.5 years of outstanding service as the Director of Medical Services at JBFCS was terminated without cause and without notice.

        2.     Dominguez, now 69 years old, found herself in the demographic cross-hairs for targeted discrimination.  New management at the residential facility where Dominguez oversaw the medical and nursing needs for about 127 medically fragile individuals found her too old, too non-observant, and too aligned with the care of her sick child to keep her employed, despite more than a decade of performance reviews that rated her performance as "outstanding/excellent" and exceeding all expectations.

3.     Dominguez is a woman and Registered Nurse ("RN") who has been working as a professional for almost her entire adult life.

4.     By the time she was fired on October 28, 2013, plaintiff was responsible for overseeing the medical and nursing needs of dozens of patients who suffered from multiple complex and chronic medical diagnoses, oftentimes a combination of both physical and psychiatric disorders living in JBFCS residential facilities known as the "Mishkon Division." Dominguez was a dedicated employee who was consistently praised for her work ethic and performance by her superiors, staff and the families of her patients.

5.     Beginning in July 2012, Dominguez began reporting to Avrohom Adler, an observant Orthodox Jew.  Immediately after his appointment, Adler began a crusade to ensure that staff in the departments reporting to him were comprised of Orthodox or highly observant Jews and individuals substantially younger than plaintiff.  Adler actively advanced the careers of younger employees who shared his level of faith, including creating new positions for such employees, to the exclusion of plaintiff and at least one other older employee who was non-Orthodox.

6.     Adler also discriminated against Dominguez by refusing her repeated requests for additional staff; in essence, he attempted to set her up to fail to the detriment of Mishkon patients.  With the exception of Dominguez's department within the Mishkon Division, wherein 50 percent of her direct report positions were vacant, all other departments reporting to Adler enjoyed a full complement of staff.  Adler's biased refusal to address the staffing problem in Dominguez's department is particularly repugnant, given the unique medical, physical and emotional needs of Mishkon patients.

7.    In Spring 2013, Dominguez took leave to care for her disabled son who was critically ill, requiring emergency surgery.  Just weeks after Dominguez returned from leave, JBFCS fired her without explanation and pressured her to resign in writing before JBFCS would even show her a separation package.

8.    Plaintiff brings this action for discrimination in the terms, conditions, and privileges of employment based on association with an individual with a disability or perceived disability, in violation of the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. (the "ADA") and the New York City Human Rights Law, N.Y.C. Administrative Code, § 8-101 et seq. (the "City Law"); JBFCS's interference with benefits and retaliation for the exercise of rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"); discrimination on the basis of race in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981"); and discrimination on the basis of creed in violation of the New York State Human Rights Law, Executive Law § 290 et seq. (the "Executive Law") and the City Law.  Plaintiff further brings this action to remedy age discrimination under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), the Executive Law and the City Law.  Finally, Dominguez asserts against Avrohom Adler claims of age discrimination under the Executive and City Laws; interference with benefits and retaliation for the exercise of rights under the FMLA; and discrimination on the basis of race and creed under Section 1981 and the Executive and City Laws.

9.    Dominguez seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate equitable and legal relief pursuant to the FMLA, the ADA, Section 1981, the ADEA, and the Executive and City Laws.

## PARTIES

10.    Dominguez is a resident of the State of Nebraska.  She worked for JBFCS for 11.5 years, until she was unlawfully fired on October 28, 2013.

11.    JBFCS is a mental heath and social services 501(c)(3) non-profit agency headquartered at 135 West 50th Street in New York, New York.  JBFCS is the largest human services organization in New York City.

12.    At all relevant times, JBFCS employed more than 50 employees and satisfied the definition of "employer" under all applicable statutes.[1]

13.    JBFCS offers social services and mental health programs to New Yorkers. Programs include a Division for Developmental Disabilities where Dominguez was employed for over a decade after nearly 20 years working at Miami Cerebral Palsy Residential Services, an affiliate of United Cerebral Palsy.

14.    JBFCS was originally founded in 1874 to provide resources to the Jewish immigrant population.[2]  Today JBFCS is a non-profit that provides diverse social services to "New Yorkers from all religious, ethnic and socioeconomic backgrounds . . . ."[3]

15.    JBFCS describes its mission as follows:

> For more than 140 years, [JBFCS] has been helping New Yorkers realize their potential and live as independently as possible[.] We promote resilience and recovery by addressing all aspects of an individual's life including mental and physical health, family, housing, employment and education across the five boroughs and in Westchester[.] We serve more than 35,000 New Yorkers from all religious, ethnic and socioeconomic

---

[1]    See http://www.jbfcs.org/programs-services/#.VtdXAH0rK70 (stating that JBFCS employs 3,300 individuals).

[2]    See https://jewishboard.org/about-us/our-history.

[3]    JBFCS Form 990, covering the period July 1, 2013 through June 30, 2014, available at http://207.153.189.83/EINS/135564937/135564937_2013_0b5a7661.PDF.

<u>backgrounds each year</u>.  JBFCS provides a comprehensive array of mental health, family support, and developmental disabilities services our mental health clinics and satellites located in all five boroughs annually serve more than 10,000 New Yorkers struggling with a range of mental and behavioral health issues[.]  We also provide community-based treatment and residential services to children and adults living with mental illness[.] . . . (emphasis added).[4]

16.     JBFCS's open door policy and nonsectarian approach to its provision of services is reiterated in the JBFCS Code of Conduct.  Specifically, JBFCS describes itself as "committed to meeting the . . . needs of individuals and families, both in the Jewish community and the broader community. . . .  [W]e provide access to treatment and care to clients, regardless of culture, race, ethnicity, religion, gender identity, age, sexual orientation, and differing abilities."

17.     The Code of Conduct further reflects JBFCS's commitment to providing its employees "equal employment opportunities" and prohibiting "discriminatory employment practices . . . ."

18.     In 2015, of JBFCS's $211,798,537 in total support and revenue, government support and revenue comprised $173,372,463, or approximately 82%.[5]

19.     Among other services, JBFCS runs 10 residential facilities serving individuals with developmental disabilities in Brooklyn, New York.

20.     The residential facilities that Dominguez oversaw were not exclusively for Orthodox Jewish patients, nor for Jewish patients.

21.     Defendant Avrohom Adler is a resident of the State of New York.

---

[4]    <u>Id.</u>

[5]    JBFCS 2014 – 2015 Consolidated  Financial Report, <u>available at</u> https://jewishboard.org /wp-content/uploads/2016/02/jb_audit_2015.pdf.

<u>JURISDICTION AND VENUE</u>

22.     Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331, 1343(a)(4); 42 U.S.C. § 12117(a); and 29 U.S.C. §§ 626,  2617.  This Court has supplemental jurisdiction over plaintiff's Executive Law and City Law claims pursuant to 28 U.S.C. § 1367 because her State and City claims closely relate to her federal claims, and arise from a common nucleus of operative facts such that they form part of the same case or controversy.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant JBFCS is headquartered in New York, New York.

24.     Pursuant to § 8-502(c) of the City Law, plaintiff has caused to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

25.     Dominguez filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 16, 2014, alleging violations of the ADEA, ADA and Title VII.  On or about March 2, 2016, the EEOC issued a Letter of Determination finding reasonable cause to believe that JBFCS discriminated against Dominguez on the basis of associational disability and age.  On or about April 22, 2016, the EEOC issued plaintiff a Right to Sue letter.  Dominguez has complied fully with the administrative prerequisites of the ADA and ADEA.

<u>FACTUAL ALLEGATIONS</u>

<u>Background</u>

26.     For more than 30 years, Dominguez has provided nursing care and coordinated the medical oversight and needs for intellectually and developmentally disabled individuals suffering from multiple complex and chronic medical diagnoses and risk factors, such as

uncontrolled seizure disorders; oral motor dysfunctions resulting in aspiration pneumonias and other pulmonary complications causing the inability to safely eat; rare genetic syndromes that severely compromised overall health; and, in multiple cases, individuals who were dually diagnosed with psychiatric disorders, including schizophrenia, dementia, and abusive and injurious behaviors that carried a risk to cause harm to the patients themselves and others.

27.     Prior to being hired by JBFCS, Dominguez worked for more than 18 years at Miami Cerebral Palsy Residential Services.  Dominguez worked for seven years as their RN Medical Coordinator and the remaining eleven years as Director of Nursing until she relocated to New York to accept a position with JBFCS.

28.     Dominguez has a three year degree in Professional Nursing from Beth Israel Hospital Medical Center School of Nursing.  She received her RN license in 1967 and thereafter found her professional calling – caring for highly compromised, chronically ill individuals who often cannot speak, feed themselves or ambulate.  It is a specialized calling in which Dominguez has excelled as a communicator, caregiver and medical professional.

29.     In or about 1995, Dominguez was one of the first 200 nurses in the country to attain national certification through testing recognizing her expertise in the specialized field of Developmental Disability Nursing.

30.     Dominguez was hired to work for JBFCS on July 15, 2002 as the Director of Medical Services for a division of JBFCS known as the "Mishkon Division."

31.     Dominguez was hired by then Medical Director of JBFCS, Dr. Bruce Gordon.

32.     Dominguez served as the Director of Medical Services for Mishkon from 2002 until her employment was terminated on October 28, 2013.

33.     As Director of Medical Services, Dominguez oversaw the medical and nursing needs of approximately 127 individuals living in inpatient residential communities.

34.     Dominguez was responsible for staffing the Mishkon residential facilities 24 hours a day, seven days a week.

35.     Dominguez's position also required the supervision of 20 nurses/nursing slots, a per diem pool of four to five nurses, and the administrative oversight of the Mishkon Division Nurse Practitioner, Primary Physician, Psychiatrist, Physical Therapist, Occupational Therapist, and the Speech and Nutritional Therapists.  In total, Dominguez had approximately ten direct reports.

36.     Dominguez's supervisory responsibilities as Director of Medical Services included, but were not limited to, overseeing all nursing staff and direct care staff in relation to any nursing functions and organizing, maintaining and supervising members of the Approved Medication Assistive Personnel ("AMAP") who worked at Mishkon.[6]

37.     As part of her job, Dominguez was also entrusted with the responsibility of creating internal policies and procedures for medical, nursing, emergency, dietary, and pharmacy services, and coordinating with the Drug Enforcement Administration and the Department of Health to implement specific policies and procedures to enable JBFCS to acquire licenses for the administration of controlled substances to Mishkon patients.

38.     Dominguez was also the point person for reporting medical emergencies, a liaison with hospitals and other health care organizations, and served as a medical representative for purposes of program planning and program/agency committees.

---

[6]    JBFCS's AMAP staff were non-licensed residential direct care employees who were certified by the State of New York to administer certain medications.

39.     Dominguez's job responsibilities were strictly secular; she did not perform, was not hired to perform, nor did she wish to perform, any religious functions during her employment with JBFCS.

40.     Throughout the time Dominguez worked at JBFCS, she reported to the Director of the Mishkon Division.  Initially, she reported to Dr. Joel Rosenshein ("Dr. Rosenshein"), then to Devora Thau ("Thau") and, beginning in July 2012, to Avrohom Adler.

41.     For more than 11 years, JBFCS rated Dominguez's performance as "outstanding/excellent" and exceeding all expectations.

42.     Dominguez consistently received positive feedback from Directors Dr. Rosenshein and Thau, colleagues and other staff.  Dominguez also received oral praise from the families of the individuals in her care.  Dominguez's positive performance is evidenced by the consistent raises that she received throughout the time she worked for JBFCS until she was abruptly fired in 2013.

43.     Dominguez was never criticized, reprimanded, or otherwise disciplined in any way during her employment, nor was she given any reason to believe that her performance was anything but exemplary.

44.     In addition to Dominguez's salary, she was also fully vested in the JBFCS's pension program.  JBFCS contributed directly to the program and was required to make larger contributions to Dominguez's pension as she accumulated more years of service.  As a Director, Dominguez was also entitled to five weeks of paid vacation per year.

<u>Discrimination on the Basis of Age, Race and Creed</u>

45.     JBFCS fired Dominguez at age 66.

46.     Dominguez is a Reform Jew.  She is not a member of a temple and does not adhere to a special dress code or dietary restrictions.  Dominguez observes only major Jewish holidays, such as Yom Kippur and Passover.

47.     In or about July 2012, Adler was hired as the new Director of the Mishkon Division of Development Disabilities.

48.     Adler is an observant Orthodox Jew.

49.     Shortly after Adler's appointment, JBFCS, through Adler, began advancing the careers of Orthodox or very observant Jewish employees who were substantially younger than Dominguez. Specifically, after Adler was promoted to Director, he proceeded to create new positions for and internally promote younger, Orthodox or very religious Jewish individuals.

50.     Of Adler's nine direct reports, including plaintiff, six positions were created for Orthodox or very observant individuals, all of whom were younger than Dominguez.  The positions Adler created included: Director of Clinical Services for Mishkon; Assistant Director for Individualized Residential Alternatives ("IRA"); Assistant Director for Intermediate Care Facilities ("ICF"); Director – Performance Improvement; Business Manager; and Director of Medical/Waiver Services.  With the exception of one role, Director – Performance Improvement, all of the newly created positions constituted promotions.

51.     Since the time Adler became Director, more than half of his direct reports who were promoted into newly created positions were at least ten years younger than Dominguez, and were Orthodox Jews or very observant Jews, like Adler.

52.     The one other individual who directly reported to Adler who was over age 50 and a non-Orthodox Jew, the Director of one of the ICFs for Mishkon, had his hours reduced after Adler ascended to the Directorship.

53.     Adler also exhibited favoritism toward younger, Orthodox or very observant Jewish employees by permitting such employees a full complement of staff, while depriving Dominguez of adequate staffing, requiring her to work 11-13 hour days.

54.     Of the approximately 20 positions Dominguez supervised, 50 percent went unstaffed.

55.     Excluding Dominguez's department, all other departments that reported to Adler enjoyed a full complement of staff.

56.     Despite Dominguez's numerous requests for additional staffing, including a request to fill the position of Associate Director of Nursing, one of her direct reports and the position that would have been her "number two," neither JBFCS nor Adler made any effort to fill Dominguez's significant departmental vacancies.   In fact, no one was hired to Dominguez's department during Adler's tenure.

57.     JBFCS's refusal to staff Dominguez's department required her to work in excess of her designated 35-hour work week so that she could ensure that the needs of the Mishkon residents were met.

58.     For example, during the Hurricane Sandy crisis, which directly impacted JBFCS's Brooklyn facilities, although herself a New Jersey resident at the time, Dominguez personally stayed overnight with her Mishkon residents in Brooklyn for four nights to ensure that they were appropriately cared for and supervised during the storm that devastated the Northeast and left New York City without power for days.

59.     The understaffing at the residences in the Medical Department was particularly problematic, given the medical, physical and emotional needs of Mishkon residents.

60.     Dominguez was told that JBFCS's lack of hiring and woeful understaffing was due to a desire to "restructure."  However, no restructuring of Dominguez's department ever took place during her tenure.

Dominguez's Son Becomes Disabled

61.     In or around November 2012, Dominguez's son fell ill, suffering from low hemoglobin levels.  Plaintiff's son received blood transfusions for his condition.

62.     In the Spring of 2013, Dominguez's son's doctors discovered bleeding ulcers in his abdomen and determined that he required emergency surgery.  Specifically, Dominguez's son needed a gastrectomy to remove part of his stomach.

63.     Dominguez's son was living in the Dominican Republic at the time.  His local doctors recommended that the gastrectomy be performed in Miami, Florida.   Dominguez's son's doctors and the Dominguez family originally believed that he would need to be immediately airlifted to Miami for surgery.  However, after Dominguez's son underwent treatment in the local hospital, and with Dominguez's maternal and professional care, her son's pain was sufficiently managed such that Dominguez and her son were able to fly commercially to Miami for his surgery.

64.     Following a long period of recuperation, Dominguez's son returned home to the Dominican Republic, only to relapse and again become critically ill with pancreatitis, requiring additional hospitalization and a ventilator.   Once her son was stabilized, he was subsequently transferred back to the Intensive Care Unit in Miami for additional emergency surgery.

65.     Due to these emergencies, Dominguez requested and was granted FMLA leave to care for her disabled son.

66.     Between April and May 2013, Dominguez took approximately four weeks of medical leave to care for her son.  When Dominguez's son relapsed in August 2013, she took

roughly two weeks of FMLA leave. Thereafter, between September and October 2013, Dominguez's son's care required her to take approximately two weeks of medical leave.

67.     During her FMLA leaves, Dominguez made every effort to return to work when she was able to take time away from caring for her disabled son. Although Dominguez was absent with permission for a number of weeks, throughout her leave, she was constantly in contact with her staff and boss Adler, including by email and telephone. Dominguez continued to remain on-call 24/7 throughout that period.

68.     Dominguez returned to work on October 7, 2013.

<u>Dominguez is Unlawfully Fired</u>

69.     On October 28, 2013, just three weeks after Dominguez's return from FMLA leave to care for her disabled son, she was summoned to meet with Adler and a Human Resources ("HR") Representative, Rand Palmer.

70.     During the meeting, Dominguez was told that she had two options: resign or have her employment terminated. When Dominguez asked why, she was told only that, in sum and substance, JBFCS "was going in a new direction and there was no place for her in the plan."

71.     Aside from this purported "new direction," Dominguez was not given any reason for the termination during the meeting.

72.     Neither the HR representative nor Adler suggested that Dominguez's employment was being terminated for cause and, in fact, JBFCS offered Dominguez a severance package, which is not typically given to someone fired for misconduct.

73.     However, to receive the package, JBFCS demanded that Dominguez immediately resign in writing and waive any and all legal claims she may have against JBFCS, including discrimination.

74.     Dominguez was told that if she wanted to even see a copy of the separation agreement/release she must first submit a writing stating that she voluntarily resigned.

75.     Dominguez was instructed to memorialize her "decision" to resign on a scrap of paper.

76.     Curious about the purported "package" she might receive and terrified of an uncertain future unemployed, Dominguez drafted a note stating, in sum and substance, that she would resign, but included a protest of JBFCS's treatment of her, the unjustified termination of her employment, and the untenable ultimatum she had been given.

77.     After accepting the note, JBFCS provided Dominguez a copy of the separation agreement/release.

78.     The separation agreement proposed a mere two weeks of salary in severance and purported to give her 21 days to consider it.

79.     Dominguez's resignation under protest on that scrap of paper resulted in a frenetic series of recorded voicemails to her home phone, a FedEx letter, and a hand-delivered letter to her home in New Jersey over the next several days.

80.     JBFCS's communications demanded that Dominguez "accept termination" and submit an "unqualified resignation" by November 4, 2013 at 5:00 p.m.

81.     Dominguez refused to "accept termination" and reiterated, in sum and substance, that she did not resign voluntarily.

82.     In retaliation, on November 4, JBFCS rescinded the severance package it had offered plaintiff, well before the expiration of the 21 days Dominguez was given to consider it.

83.     Shortly after she was fired, Dominguez was replaced by a woman 13 years younger than her who is an Orthodox Jew, Miriam Taub.

84.     After more than 11 years, JBFCS put Dominguez out of work and forced her, at the age of 66, to pound the pavement.

85.     As is her nature, Dominguez immediately sought new employment to support herself not only in New York, but up and down the East Coast.

86.     Unable to make ends meet without a job, after six months of searching, Dominguez had to accept her only job offer – a position in Nebraska, thousands of miles away from her family and support network in a state where she knew no one.

87.     At 67 years of age, Dominguez packed up her apartment and drove across the country in a rented moving truck.  Dominguez began as the Director of Nursing in a state-run facility on May 12, 2014.

88.     In Dominguez's new position, she earns thirty percent less in salary and is permitted substantially fewer vacation days.

89.     Moreover, she is now more than a thousand miles from her oldest son and even farther from the one who suffered the disabling illness in 2013.

90.     The financial and emotional costs of having to move across the country to support herself are substantial and ongoing.

<u>FIRST CAUSE OF ACTION</u>

<u>ADEA – Age Discrimination</u>

(Against JBFCS)

91.     Plaintiff repeats and realleges paragraphs 1 to 90 of this Complaint as if fully set forth herein.

92.    By the acts and practices described above, JBFCS discriminated against plaintiff in the terms and conditions of her employment on the basis of her age in violation of the ADEA.

93.    JBFCS knew that its actions constituted unlawful discrimination on the basis of age or showed reckless disregard for plaintiff's statutorily protected rights.  These violations are willful within the meaning of the ADEA.

94.    As a result of JBFCS's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

<u>SECOND CAUSE OF ACTION</u>

<u>FMLA – Interference</u>

(Against JBFCS and Adler)

95.    Plaintiff repeats and realleges paragraphs 1 through 94 of this Complaint as if set forth fully herein.

96.    By the acts and practices described, defendants interfered with, restrained, and denied plaintiff her rights under the FMLA in violation of the FMLA.

97.    Adler exercised substantial control over plaintiff's employment, including being involved in decisions concerning Dominguez's FMLA leave and participating in the meeting during which defendants terminated plaintiff's employment.

98.    Defendants knew that their actions violated the FMLA and/or defendants' actions were not made in good faith.

99.    As a result of defendants' interference, Dominguez has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish,

emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

### FMLA – Retaliation

(Against JBFCS and Adler)

100.    Plaintiff repeats and realleges paragraphs 1 through 99 of this Complaint as if set forth fully herein.

101.    By the acts and practices described, defendants retaliated against plaintiff for exercising her rights under the FMLA in violation of the FMLA.

102.    Adler exercised substantial control over plaintiff's employment, including being involved in decisions concerning Dominguez's FMLA leave and participating in the meeting during which defendants terminated plaintiff's employment.

103.    Defendants knew that their actions violated the FMLA and/or defendants' actions were not made in good faith.

104.    As a result of defendants' retaliatory acts, Dominguez has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

### Section 1981: Race Discrimination

(Against JBFCS and Adler)

105.    Plaintiff repeats and realleges paragraphs 1 through 104 of this Complaint as if set forth fully herein.

106.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her race in violation of Section 1981.

107.    Adler was plaintiff's supervisor and was personally involved in the discrimination against her.

108.    Defendants engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

109.    As a result of defendants' discriminatory acts, Dominguez has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

<u>FIFTH CAUSE OF ACTION</u>

<u>ADA – Disability Discrimination</u>

(Against JBFCS)

110.    Plaintiff repeats and realleges paragraphs 1 through 109 as if fully set forth herein.

111.    By the acts and practices described above, JBFCS discriminated against plaintiff in the terms and conditions of her employment on the basis of her relationship or association with an individual with a disability or perceived disability.

112.    JBFCS knew its actions were in violation of the law; these actions were willful and malicious.

113.    As a result of JBFCS's discriminatory acts, Dominguez has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

<u>SIXTH CAUSE OF ACTION</u>

<u>City Law – Discrimination on the Basis of Age, Creed and Associational Disability</u>

(Against JBFCS and Adler)

114.    Plaintiff repeats and realleges paragraphs 1 through 113 as if fully set forth herein.

115.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of creed, age, and plaintiff's relationship or association with an individual with a disability or perceived disability in violation of the City Law.

116.    Adler was plaintiff's supervisor, participated in the discriminatory conduct against plaintiff, and had the authority to hire, fire and/or administer the terms, conditions or privileges of plaintiff's employment.

117.    In the alternative, Adler aided and abetted JBFCS's discriminatory conduct against plaintiff.

118.    Defendants knew their actions were in violation of the law; these actions were willful and malicious.

119.    As a result of defendants' actions, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## SEVENTH CAUSE OF ACTION

### Executive Law – Discrimination on the Basis of Age and Creed

#### (against JBFCS and Adler)

120.    Plaintiff repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of creed and age in violation of the Executive Law.

122.    Adler was plaintiff's supervisor, participated in the discriminatory conduct against plaintiff, and had hiring/firing authority.

123.    In the alternative, Adler aided and abetted JBFCS's discriminatory conduct against plaintiff.

124.    Defendants knew their actions were in violation of the law; these actions were willful and malicious.

125.    As a result of defendants' actions, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.


## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.    declaring that the acts and practices complained of herein are in violation of the ADA, FMLA, Section 1981, the ADEA, the Executive Law, and the City Law;

b.      enjoining and permanently restraining these violations of the ADA, FMLA, Section 1981, the ADEA, the Executive Law, and the City Law;

c.      directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

d.      directing defendants to place plaintiff in the position she would have occupied but for defendants' discriminatory and retaliatory conduct and making her whole for all earnings and other benefits she would have received but for defendants' discriminatory treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.      directing defendants to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

f.      directing defendants to pay plaintiff punitive damages as provided by the ADA, Section 1981, and the City Law;

g.      directing defendants to pay plaintiff liquidated damages as provided by the ADEA and FMLA;

h.      awarding plaintiff her reasonable attorneys' fees and costs;

i.      awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

j.      granting such other and further relief as the Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
       May 23, 2016

VLADECK, RASKIN & CLARK, P.C.

By:     _____
        Susan J. Walsh
        Allison L. Van Kampen
        Attorneys for Plaintiff
        565 Fifth Avenue, 9th Floor
        New York, New York 10017
        (212) 403-7300